In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-20-00094-CR
_____

SAMED RAFIQ, Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B190176-R**

## OPINION

A jury found Samed Rafiq guilty of murdering Nathaniel Anderson, and in the punishment phase of his trial assessed a fifty-eight-year sentence. After the trial court pronounced judgment, Rafiq filed an appeal. In three appellate issues, Rafiq asserts (1) the evidence is insufficient to support his conviction, (2) the trial court erred in denying his motion to suppress evidence that police obtained following the

1

warrantless seizure of his cell phone, and (3) the trial court erred in admitting the fruits of the search, which police obtained after obtaining a warrant following the warrantless seizure that authorized the search they conducted of his phone. Because we conclude Rafiq's issues lack merit, we affirm.

## Background

In describing the background, we view the evidence in the light favoring the jury's verdict, so we have assumed that when reaching its verdict the jury found the testimony of the State's primary witness—Kevin VanHorne—credible and found Rafiq's own testimony was not.[1] The evidence from Rafiq's trial shows that he met Nathaniel Anderson,

---

[1]*See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (explaining "the reviewing court is required to defer to the jury's credibility and weight determinations" when reviewing a claim asserting the evidence doesn't support the jury's verdict). As a result, our discussion of the background defers to the jury's determinations over any conflicts in the evidence unless it would not have been reasonable for the jurors to have resolved the conflicts in a manner that favored the jury's verdict. We also note that there are various spellings of the name VanHorne in the record. In its brief, the State spells VanHorne's name "Van Horne." But the court reporter and the appellant in his brief both used the spelling "VanHorne." Because "VanHorne" is the spelling used in the reporter's record, we have spelled the witness's last name "VanHorne."

whom the jury ultimately found Rafiq murdered, while they were using the online gaming platform, Steam. Several years after meeting each other and developing a friendship with each other online, Anderson invited Rafiq to come to Orange, Texas, after telling Rafiq they could get rich by investing together. So in April 2017, Rafiq flew to Houston where he met Anderson and Kevin VanHorne, who was living with Anderson and was one of Anderson's friends. After picking Rafiq up at the airport, VanHorne returned Anderson and Rafiq to Orange, where Anderson and VanHorne were living in separate bedrooms in Anderson's two-bedroom mobile home.

After arriving in Orange, Rafiq moved into the mobile home and slept in the living room of Anderson's home. After about a month, Anderson invited several of his friends to attend a party at his home. The evening of the party, May 2, 2017, Anderson entered VanHorne's room and told VanHorne he was looking for his handgun. Even with VanHorne's help, Anderson and VanHorne didn't find the gun.

Around eight o'clock the next morning—which according to the indictment is the day Rafiq allegedly committed the murder—VanHorne drove Anderson's last guest home from the party. According to

3

VanHorne, when he returned to the mobile home, Rafiq was in the living room. Even so, VanHorne said he didn't know what Rafiq was doing. Around fifteen minutes later, based on a request that Anderson had made of him earlier, VanHorne entered Anderson's bedroom, woke him up, and then returned to his own room. At trial, VanHorne testified that after returning to his room, "all I know is I heard an argument, and then there was a scuffle, and then I heard the gunshot."

A few minutes later, Rafiq entered VanHorne's bedroom, where he told VanHorne he and Anderson had argued after he told Anderson he wasn't interested in Anderson's plans to invest in stocks and had instead decided, along with VanHorne, to leave. VanHorne also testified that Rafiq claimed Anderson responded by threating to kill him. And VanHorne testified that Rafiq, that morning in his bedroom, admitted he shot Anderson and then demanded that he assist in disposing of Anderson's body. According to VanHorne, Rafiq threatened that should he refuse to help, he would meet the same fate as Anderson. VanHorne testified that when Rafiq made this threat, he was holding a gun.[2]

---

[2]During direct examination, VanHorne admitted he was currently serving a ten-year sentence for tampering with physical evidence because

4

After leaving his bedroom, VanHorne entered Anderson's bedroom and saw Anderson lying in his bed in a pool of blood. About five or six o'clock that evening, May 3, 2017, Rafiq and VanHorne went to two large box stores, where they obtained supplies that they used later that night to dispose of Anderson's body. After returning to Anderson's mobile home after purchasing the supplies, VanHorne helped Rafiq tape Anderson's body in a fetal position and cover the body with a tarp. Then, VanHorne put Anderson's body in his car, and after that the men took the body to a remote location behind an abandoned store. As VanHorne told it, before burying Anderson's body, Rafiq cut Anderson's body into pieces, dug holes, and then buried the body parts. VanHorne said his role in burying Anderson was holding a flashlight; he claimed that he had not participated in the rest because he "couldn't stand the sight of my friend being cut up like that."

After Anderson's body was buried, Rafiq and VanHorne returned to the mobile home, where he stayed a few more weeks. Rafiq, who VanHorne said had Anderson's phone, used it while pretending to be

---

he had helped Rafiq dispose of Anderson's body. According to VanHorne, the State had not promised him anything in return for his testimony.

Anderson, responding to texts sent to Anderson by Anderson's friends. The jury also heard testimony that several weeks after Anderson died, Rafiq and VanHorne were seen in the trailer park burning items. According to VanHorne, he and Rafiq burned these items because they contained Anderson's blood.

In late May 2017, VanHorne and Rafiq moved out of Anderson's home. In mid-June 2017, Rafiq moved to Spring, Texas, because he has relatives there. According to VanHorne, when Rafiq was living with him and after Anderson's murder, Rafiq was always carrying Anderson's gun. When Rafiq moved out, VanHorne said, Rafiq took the gun.[3]

In June 2017, someone from Anderson's family called the police and reported Anderson missing. The Orange County Sheriff's Office assigned the case to Detective Dru Crochet, who contacted VanHorne. VanHorne told the detective someone "came and picked [Anderson] up and left and they never came back[,]" which according to VanHorne was the story that he and Rafiq had agreed to tell the police when questioned about why Anderson disappeared. Later, when Detective Crochet contacted VanHorne again about Anderson's disappearance, VanHorne told the

---

[3]Police never recovered the gun used to kill Anderson.

6

detective that Rafiq shot and killed Anderson and buried his body in the woods. In the trial, VanHorne admitted he lied to police on that occasion too about the exact date Anderson's murder occurred, since he told police when he was questioned that Anderson's murder happened around the end of May rather than when it occurred, May 3rd.

A few days after discovering Anderson's body, Detective Crochet and Sergeant David Lampman located Rafiq, who was living with relatives in Harris County. When the officers appeared at the house where Rafiq was living, Rafiq voluntarily agreed to go with Detective Crochet and Sergeant Lampman to the Harris County Sheriff's Office and be interviewed in connection with the investigation they were conducting to locate a missing person.

During the interview, Rafiq told the officers that when he was living in Anderson's mobile home, he didn't like the way Anderson was treating VanHorne. Rafiq also told the officers in his interview that he finally told Anderson that he and VanHorne were planning to leave. According to Rafiq, VanHorne and Anderson were the only people in the mobile home when he told Anderson that he was leaving with VanHorne. Sergeant Lampman testified that when he asked Rafiq whether he and Anderson

7

had fought, Rafiq said that he and Anderson did become involved in "an animated conversation" involving the subject of Rafiq and VanHorne "moving out." After Rafiq admitted he had what he described as an "animated conversation" on the subject of moving out on May 3rd, Sergeant Lampman said Rafiq told Lampman that, following the conversation that he had with Anderson about moving out, he (Rafiq) entered VanHorne's bedroom, where he told VanHorne: "[T]he problem was handled." When Sergeant Lampman asked Rafiq whether he shot Anderson, Sergeant Lampman said that Rafiq avoided giving a direct response; instead, Lampman said Rafiq deflected from answering and said: "Guys, I thought I was here for a missing person."

On appeal, Rafiq suggests that VanHorne's testimony together with the other circumstantial evidence of his guilt fails to prove he murdered Anderson beyond a reasonable doubt. But by finding Rafiq guilty, the jury implicitly rejected the argument Rafiq presents in his appeal. The State called nineteen witnesses in the guilt-innocence phase of the trial. On appeal, Rafiq asks that this Court find the jury acted unreasonably when it found Rafiq guilty of murder because, according to the argument Rafiq makes in his brief, VanHorne was the "lone witness" who said he shot

8

Anderson and his testimony is too unreliable for the jury, had it acted reasonably, to be believed. Since Rafiq's argument hinges on whether the jury could have reasonably credited VanHorne's testimony in favor of its verdict, we will discuss the testimony of the other witnesses only as necessary to support our resolution of Rafiq's argument claiming the evidence is insufficient to support the jury's verdict. And before discussing Rafiq's evidentiary issues, which concern the seizure and admission of evidence police obtained from Rafiq's cell phone, we begin with Rafiq's first issue, which argues the evidence is insufficient to support the jury's verdict.

Sufficiency Issue

*Standard of Review*

When reviewing claims asserting the evidence is insufficient to support a jury's verdict, we review the evidence admitted in the trial in the light that favors the jury's verdict and decide whether a rational factfinder, from that evidence, could have found the defendant guilty beyond reasonable doubt.[4] In trials to juries, the jury is the ultimate

---

[4]*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

authority in deciding which witnesses are credible and in deciding what weight to give any particular testimony or evidence.[5] As a reviewing court, we give full deference to the jury's right to fairly resolve conflicts that may exist in the evidence, to weigh the evidence, and to draw reasonable inferences from the basic facts proven at trial to ultimate facts the jury must decide before answering the questions in the charge.[6] If the record shows that reasonable jurors could have made inferences other than those supporting the verdict, we must presume the jurors chose to resolve those conflicts in favor of the verdict the jury reached, and we must defer to that resolution if it is one that, based on the evidence, is rationale.[7] In deciding whether the inferences the jury made were reasonable, we look to the combined and cumulative force of the evidence after viewing the evidence in the light most favorable to the jury's verdict.[8]

While the standard requires deference by a reviewing court, juries "are not permitted to come to conclusions based on mere speculation or

---

[5]*Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981).
[6]*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).
[7]*Brooks*, 323 S.W.3d at 899 n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).
[8]*Clayton*, 235 S.W.3d at 778.

factually supported inferences or presumptions."[9] We must determine whether the inferences the jury made in reaching its verdict "are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict."[10] In our review, we view circumstantial evidence as equally probative as direct evidence in deciding the defendant's guilt, meaning that circumstantial evidence alone may offer sufficient support for a jury's verdict.[11] And in our review, each witness's testimony need not point directly to the defendant's guilt; instead, the question is whether the combined and cumulative force of the incriminating circumstances, as proven in the trial, supports the jury's verdict.[12] Thus, even when the parties disagree "about the logical inferences that flow from undisputed facts, [w]here there are two permissible views of the evidence, the [jury's] choice between them cannot be clearly erroneous."[13]

---

[9]*Hooper*, 214 S.W.3d at 15-16.
[10]*Id.* at 17.
[11]*Jenkins v. State,* 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).
[12]*Hooper*, 214 S.W.3d at 13.
[13]*Evans v. State,* 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (cleaned up).

11

*Analysis*

Rafiq argues that a jury, acting rationally, could not have credited the testimony that allowed the jury to infer he is the person who murdered Anderson that was elicited in the trial from VanHorne. But the jury rejected that same argument—that VanHorne was not credible—in the trial. In final argument, Rafiq's attorney suggested VanHorne had reasons of his own for killing Anderson. For instance, the attorney argued that when police questioned VanHorne, police said VanHorne reacted to being questioned by shaking violently. That reaction, according to Rafiq's attorney, was "certainly the sign of a very guilty person" . . . who "knew he was in trouble." And the attorney said VanHorne had blamed Rafiq for the murder to avoid prison and in order to be placed on probation instead.[14] Along with those arguments, Rafiq's attorney argued in closing that the jury could not find VanHorne a credible witness, noting that even VanHorne admitted in the trial that he lied to police more than once when questioned about Anderson's disappearance. Finally, Rafiq's attorney described VanHorne as a "self-professed schizophrenic . . . who

---

[14]During the trial, VanHorne testified he did not have "any deals to testify or anything like that" to testify on behalf of the State.

hears Nathaniel talking to him[,]" and as someone who attempted suicide before Anderson's death. To be clear, on cross-examination VanHorne testified he hears Anderson's voice "in [his] ear[,]" explaining that when that happens, Anderson tells him that he (VanHorne) will never "leave jail" and "was pushing [him] towards suicide."[15]

Under Texas law, a person commits murder if he "intentionally or knowingly causes the death of an individual."[16] When the trial concluded, Rafiq's attorney argued the foundation of the State's case rested on the testimony of Kevin VanHorne. As the factfinder, the jury, acting rationally and as the sole judge of the credibility of the witnesses, had the right to credit the testimony in favor of its finding of guilt because:[17]

- From VanHorne's testimony, the jury could reasonably conclude only three people were inside the mobile home when Anderson was killed, VanHorne, Anderson, and Rafiq. VanHorne testified that on May 3, 2017, he heard the report from a gun while in his room. And Rafiq testified that after arguing with Anderson, he spoke to

---

[15]No medical records or doctor's testimony was admitted in the trial to prove that VanHorne had been diagnosed or treated for schizophrenia (or any other mental condition) before or around the date relevant to Anderson's murder. Instead, at trial, VanHorne testified that schizophrenia runs in his family, and he said: "I think I have it, but I can't tell because it spiked up the hardest when I started going to prison." He also testified: "I believe I'm schizophrenic but I've just never been properly diagnosed."

[16]Tex. Penal Code Ann. § 19.02(b)(1).

[17]*See Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020).

VanHorne in VanHorne's room. VanHorne testified Rafiq admitted that he shot Anderson with a gun in the conversation he had with Rafiq on the morning of May 3rd in his room.

- VanHorne testified that after speaking to Rafiq in his bedroom, he entered Anderson's bedroom and saw Anderson lying in a pool of blood.
- VanHorne testified he was afraid of Rafiq because Rafiq threatened him, knew where he lived, and told him "he would track me down and kill me."
- VanHorne testified he obtained a loan and moved out of the mobile home and moved into an apartment the last week of May 2017, all of which occurred several weeks after Rafiq killed Anderson.
- Exhibits admitted during the trial show Rafiq and Anderson purchasing supplies like those VanHorne testified he and Rafiq used to dispose of Anderson's body on the evening of May 3rd.
- DNA evidence, tied to skeletal remains recovered by the State, show the remains the State recovered in its investigation were Anderson's. VanHorne led police to the area where they ultimately located Anderson's remains.
- Dr. John Wayne, a forensic pathologist called by the State, reviewed records and photographs of Anderson's remains. He testified that Anderson died from a "[g]unshot wound to the head." That testimony aligns with VanHorne's testimony that he heard a gunshot and then saw Anderson lying in a pool of blood on his bed.
- Testimony by firearms examiner Brandy Henley, an employee of the Jefferson County Crime Lab, described bullet fragments that police recovered from Anderson's remains as having "rifling characteristic of a Taurus[,] [consisting of] six lands and grooves with a right twist."[18] According to Henley, the caliber class of the fragments police recovered from Anderson's remains suggest "a .38 9mm caliber class." VanHorne testified that on the day the murder occurred, he saw Rafiq with Anderson's handgun.
- Chastity Barber, whose father ran the trailer park where Anderson's mobile home was located, testified that on May 29, 2017, she asked VanHorne and Rafiq why they were burning items

---

[18]The firearms examiner explained that "lands and grooves" are the cut channels inside the barrel of a firearm.

14

in the trailer park that day. VanHorne testified that he and Rafiq burned items that belonged to Anderson in the trailer park because they had Anderson's blood on them.

- Bank records on accounts held by Anderson and Rafiq at their banks show that on May 10, 2017, $630 was transferred from Anderson's account and into an account at Rafiq's bank. Anderson's statement shows that following the transfer, his remaining balance was about $2. When Anderson then failed to deposit more money into the account by June 7, the closing date on his statement, the service fee the bank charged to his account left the account with a negative balance of around $10. VanHorne testified he knew Rafiq had personal information he could use in stealing his and Anderson's identities on his phone.

- At trial, the trial court admitted several exhibits police obtained after executing a search warrant, issued by a magistrate, that allowed police to search Rafiq's cell phone. The exhibits extracted from Rafiq's cell phone include notes Rafiq made of Anderson's pin number for Anderson's debit card, his username, and his password. Other exhibits from Rafiq's cell phone admitted in the trial include a photo of Anderson's credit card, debit card, student ID, Texas driver's license, serial number for a Taurus gun, and a photo of a box of Taurus cartridges.

In our system, the jury is the ultimate authority on questions that surround matters of credibility. Assigned the task of deciding which of the witnesses gave credible testimony, the jury in Rafiq's case had the right to find VanHorne credible and to find that Rafiq, when he testified, did not give credible testimony in the trial.[19] To be sure, we recognize the record contains conflicting evidence about the exact date on which

---

[19]*See Penagraph*, 623 S.W.2d at 343.

15

Anderson was killed. Yet the jury had the right to resolve that conflict in reaching its verdict and in weighing the evidence of Rafiq's guilt when deciding whether Rafiq is the person who intentionally or knowingly caused Anderson's death.[20] And even if reasonable jurors might have drawn inferences different from those drawn by this jury in this trial, we must presume the jurors who observed the witnesses testify resolved the conflicts in favor of their finding of guilt.[21] When viewed in the light that favors the jury's verdict and after considering the combined and cumulative force of the direct and circumstantial evidence before the jury that supports the jury's verdict, we conclude the jury acting rationally could have found on the evidence that Rafiq was guilty of murdering Anderson.[22] Because we conclude the circumstantial evidence is more than sufficient to support the jury's verdict, we overrule Rafiq's fist issue.

Seizure of Cell Phone

In issues two and three, Rafiq argues the trial court erred in failing to grant his "motion to suppress evidence stemming from the warrantless seizure of his cell phone" and "erred in admitting evidence obtained from

---

[20]*See Hooper*, 214 S.W.3d at 13.
[21]*See Brooks*, 323 S.W.3d at 899 n.13
[22]*See Clayton*, 235 S.W.3d at 778.

16

the warrantless seizure of his cell phone." Because Rafiq combines his arguments on these issues in his brief, we address the issues together.

*Standard of Review*

Since the record shows the State seized Rafiq's phone without a warrant, the State bore the burden on Rafiq's motion to prove the seizure of the phone fell within an exception to the general rule requiring that police obtain a warrant to seize or search someone's property.[23] On appeal, we review rulings on motions to suppress for abuse of discretion.[24] Under that standard:

> The trial court is given almost complete deference in its determination of historical facts, especially if those are based on an assessment of credibility and demeanor. The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor. However, for mixed questions of law and fact that do not fall within that category, a reviewing court may conduct a *de novo* review.[25]

---

[23]*State v. Robinson*, 334 S.W.3d 776, 779 (Tex. Crim. App. 2011).

[24]*State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

[25]*State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019) (cleaned up).

As applied to Rafiq, that standard requires us to afford almost total deference to the trial court's assessment of Sergeant Lampman's testimony about why he thought it was necessary to seize Rafiq's phone, which he said was to prevent Rafiq from destroying evidence relevant to Anderson's murder that Lampman believed authorities would find on the phone if police had time to secure a warrant that authorized police to seize the phone. Thus, we use a deferential standard in reviewing the trial court's factual assessment of the circumstances surrounding Rafiq's interview in October 2017, but we apply a de novo standard to the trial court's ultimate legal determination and finding that Sergeant Lampman acted legally in seizing the phone even though when he seized it, he did not have a warrant authorizing the seizure.[26]

*Background—The Seizure*

On appeal, Rafiq challenges the State's seizure of his phone without a warrant. Except for the occasions in Rafiq's interview of October 2017 when Rafiq voluntarily allowed Sergeant Lampman to examine his phone, the record shows that police waited until after they obtained a search warrant to search Rafiq's phone. Turning to the appellate record,

---

[26]*See State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013).

it shows that in October 2017, Rafiq voluntarily accompanied Detective Crochet and Sergeant Lampman to the Harris County Sherriff's Office after they found him living with relatives in Harris County. Upon locating Rafiq at the home of his relatives, Rafiq agreed to accompany the officers to the police station to answer their questions about a missing person. About an hour into the interview, and after Rafiq told Detective Crochet that police should be looking for Anderson in Austin, Sergeant Lampman asked Rafiq whether he had spoken to Anderson on the phone. When Rafiq "denied speaking" to Anderson recently by phone, Sergeant Lampman asked Rafiq whether he could examine Rafiq's phone and check to make sure. Rafiq removed the phone from his pocket, entered the password, and then handed the phone to Sergeant Lampman, who began looking at the phone. Within a minute, Sergeant Lampman asked Rafiq if "he would be willing to let me dump the phone and see if there's anything in it." Rafiq said: "No, no." Just after that, while Sergeant Lampman was still holding Rafiq's phone, Rafiq looked at the officer and said: "Yea, but you can check the phone." After that, Sergeant Lampman asked Rafiq whether he minded if he looked through the phone and Rafiq answered: "Go ahead and look." Five minutes later, Rafiq asked Sergeant

19

Lampman to return his phone. Sergeant Lampman complied, and Rafiq put the phone in his pocket.

Around three hours later, Sergeant Lampman asked Rafiq for his phone again, explaining he needed Anderson's phone number from the phone. With his finger, Rafiq unlocked and handed Sergeant Lampman the cell phone. Sergeant Lampman can be seen in the videorecording scrolling through the phone for around two minutes, as if he is looking for a phone number. Then Sergeant Lampman stands up and announces: "I'm going to seize it." Sergeant Lampman then left the room with Rafiq's phone, and Detective Crochet continues to interview Rafiq for around an hour until the interview concludes. After that, the officers took Rafiq back home.

*The Suppression Hearing*

Before trial, Rafiq filed a motion to suppress the evidence obtained from his phone, asserting the phone was seized without a warrant and in violation of his constitutional and statutory rights. In January 2020, the trial court conducted a hearing on the motion. Three witnesses testified in the hearing: Deputy Christopher Cooke (an employee of the Harris County Sheriff's Office); Sergeant David Lampman; and Detective

20

Crochet. Deputy Cooke testified he led Detective Crochet and Sergeant Lampman to the home where police believed Rafiq was living in October 2017 and that he was present when Rafiq came to the door. According to Deputy Cooke, after the officers explained they were investigating an important case, which involved a missing person, Rafiq agreed to go with Lampman and Crochet. Rafiq got into the car with Lampman and Crochet, who took him to a room used by the Harris County Sheriff's Office for interviewing witnesses. Deputy Cooke said he never saw anyone place Rafiq in handcuffs. Deputy Cooke explained he used a monitor in another room to watch Rafiq's interview. And he said that after Sergeant Lampman seized Rafiq's phone, he came out of the room where Rafiq was being interviewed and then handed the phone to him. After Lampman handed him the phone, the deputy said he locked Rafiq's phone in his desk, did not scroll through it, and could not have done so had he wanted to since Rafiq's phone was secured with a password.

Deputy Cooke testified that Rafiq was not arrested at the end of his interview, but instead that Lampman and Crochet returned Rafiq to the house where they had picked him up earlier that day. Two days later, Deputy Cooke signed an affidavit to support his request he filed seeking

a search warrant authorizing authorities to search Rafiq's phone. That same day, a Harris County district judge executed a search warrant, which authorized police to forensically examine Rafiq's phone.[27] When asked why police needed to seize Rafiq's phone in the interview, Deputy Cooke responded: "Because it doesn't take long to reset a phone and erase everything on it or to get rid of it, throw it out the window, smash it, whatever you need to do to destroy what's stored on that phone."

Sergeant Lampman confirmed that Rafiq was not handcuffed or restrained when he voluntarily agreed to accompany him to a Harris County police station in October 2017, where he was interviewed by Detective Crochet and Lampman about a missing person and where the phone was later seized that same day. As to the interview, Sergeant Lampman's testimony about it matches the videorecording, which we already detailed above. According to Sergeant Lampman, had Rafiq asked to leave in his interview he was free to do so. That said, Rafiq never asked to leave. Sergeant Lampman added that he would have taken Rafiq home had Rafiq asked. Sergeant Lampman also testified that after he

_____

[27]Rafiq has not challenged the scope of the search warrant in the issues or the arguments he has presented in his appeal.

told Rafiq he was seizing the phone, he walked out of the room where Rafiq was being interviewed and handed Deputy Cooke the phone. Sergeant Lampman denied that he ever attempted to search the phone after seizing it. When the officer was asked "what were the exigent circumstances that . . . you wouldn't let you wait a day[,]" Lampman answered: "That he could take his phone and destroy the evidence, anything that's on it."

Detective Crochet's testimony also tracks the videorecording of the interview. When asked whether he had "much to do with" seizing and obtaining the warrant to search Rafiq's phone, Crochet testified: "I did not." Even though Crochet didn't seize the phone, he explained he wanted to seize Rafiq's phone because it would have documented his geographical location to "prove or disapprove (sic) where Mr. Rafiq was at the time the homicide occurred[.]" According to Detective Crochet, Rafiq was told before the interview that he was not under arrest. When the interview ended, he accompanied Lampman, who drove Rafiq home.

23

When in the trial court, Rafiq's attorney argued the State had no legal authority to seize Rafiq's phone without a warrant.[28] On the other hand, the prosecutor argued that under the circumstances, the State's warrantless seizure of Rafiq's cell phone was reasonable because "it was entirely possible that anything in that phone could have been easily erased deleted, destroyed, lost" had Rafiq left the interview with his cell phone that day. The prosecutor concluded that "at that point the circumstances became exigent that they seize the phone and get a warrant." Several days later, the trial court signed an order denying Rafiq's motion to suppress.

*Analysis*

The Fourth Amendment to the United States Constitution and article I, section 9 of the Texas Constitution protects against unreasonable searches and seizures.[29] While subject to several exceptions, the well-established rule is that "'searches conducted outside the judicial process, without prior approval by judge or magistrate, are

---

[28]Rafiq's motion to suppress asserts the seizure of the cell phone without a warrant violated Rafiq's rights under the federal and state constitutions, and under State law.

[29]U.S. CONST. amend. IV.; Tex. Const. art. I, § 9; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007).

per se unreasonable under the Fourth Amendment.'"[30] Voluntary consent to search is but one of the recognized exceptions to the general rule requiring police to obtain a warrant before they seize property or conduct a search.[31] Another exception allows police based on *reasonable suspicion* rather than probable cause to seize a container and hold it so that it may be preserved while police seek to obtain a search warrant when "the exigencies of the circumstances demand it[.]"[32] Or as the Court of Criminal Appeals has explained: "A seizure based on reasonable suspicion or probable cause will generally be reasonable."[33]

In the trial court and in the appeal, Rafiq has not complained that police had his phone for two days before they obtained a warrant authorizing the phone to be searched. Since Rafiq has not challenged the duration of the seizure in his appeal, we have not considered it in resolving the arguments he has relied on in issues two and three. Rather, Rafiq argues there was "no proof of any exigent circumstances

---

[30] *United States v. Ross*, 456 U.S. 798, 825 (1982) (citations omitted).
[31] *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973).
[32] *United States v. Place,* 462 U.S. 696, 701, 702 (1983) (recognizing that exigent circumstances for seizing a container may for a reasonable period depend on reasonable suspicion rather than probable cause).
[33] *Corbin v. State*, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002).

warranting the illegal seizure." The question we must decide to resolve Rafiq's last two issues is whether the trial court abused its discretion in finding that exigent circumstances justified Sergeant Lampman's seizure of Rafiq's cell phone during his October 2017 interview nearly an hour before his interview with the police ended when police knew that unless the phone was seized, he would be leaving with it that day.

Exigent circumstances, when they exist, allow police to seize evidence they reasonably believe to contain evidence of a crime, such as a murder, to prevent the evidence from being destroyed.[34] Here, the seizure of the cell phone was limited, as Lampman seized Rafiq's cell phone only for the time police needed to obtain a search warrant to prevent the evidence Lampman suspected was on it relevant to Anderson's murder from being destroyed. With the exception of the consensual searches in the interview, which Rafiq allowed when he allowed Sergeant Lampman to scroll through his phone, the phone was detained and not searched before authorities obtained a valid search

---

[34] *See Illinois v. McArthur,* 531 U.S. 326, 331 (2001) (concluding that a warrantless seizure of a person, which prevented him from returning to his trailer to destroy hidden contraband, was reasonable "[i]n the circumstances of the case before us" because of exigency).

warrant. To justify a temporary detention, reasonable suspicion allows police to seize evidence for a reasonable period when the totality of the circumstances suggests the evidence (in this case a cell phone) contains evidence of criminal conduct and if the evidence of the circumstances relevant to the seizure shows the seizure was reasonably necessary to prevent the evidence that was seized from being destroyed.[35]

In our review of the circumstances that led to the seizure at issue, we note the central requirement of the Fourth Amendment "is one of reasonableness."[36] And because a temporary seizure by authorities interferes with a person's possessory interest in the individual's rights to their property, the interest at issue in a seizure differs from the interest at issue in a search since a search—unlike a seizure without an accompanying search—interferes with an individual's privacy. Given the differences in the interests at stake between searches and seizures, the United States Supreme Court has "frequently approved warrantless seizures of property . . . for the time necessary to secure a warrant, where a warrantless search was either held to be likely or likely would have

---

[35]*See generally Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013).

[36]*McArthur*, 531 U.S. at 330 (internal quotation omitted).

been held impermissible."[37] So the question is whether based on a totality of the circumstances a reasonable officer, given what Sergeant Lampman knew, could have reasonably concluded that Rafiq's phone contained evidence of Anderson's murder.

Rafiq argues there were no exigent circumstances that required Lampman to seize his phone, and that when the phone was seized, police did not have probable cause (which is not the right standard) sufficient to justify the seizure of his phone. To support the claim that Sergeant Lampman violated Rafiq's constitutionally protected rights against the seizure at issue, Rafiq relies heavily on *Igboji v. State*.[38] But we decline to follow our divided sister court's opinion in *Igboji*, as we conclude the court reached the wrong conclusion by applying the search standard articulated in *Turrubiate v. State*,[39] a case from the Court of Criminal Appeals, which addressed the warrantless search of a home. The question we must decide is whether the phone was illegally seized, not whether it was illegally searched, as the record shows the phone was searched after

---

[37]*Segura v. United States*, 468 U.S. 796, 806 (1984); *Sanchez v. State*, 365 S.W.3d 681, 686 (Tex. Crim. App. 2012).
[38]*Igboji v. State*, 607 S.W.3d 157, 161 (Tex. App.—Houston [14th Dist.] 2020, pet. granted).
[39]*Turrubiate v. State*, 399 S.W.3d 147, 151 (Tex. Crim. App. 2013).

28

a magistrate issued a search warrant whose validity has not been separately challenged in the appeal. We decline to follow the majority opinion in *Igboji* because, as the dissenting justice in *Igboji* pointed out, "[t]here are enormous differences between searches and seizures" under the law. It is those very differences that gave Sergeant Lampman the right to temporarily detain Rafiq's cell phone for a reasonable period so that police had the time to seek a valid search warrant that, when and if the warrant issued, would allow authorities the legal authority and right, within the limitations set out in the search warrant, to search for evidence of a crime on Rafiq's phone.

So turning to the record, what does it show Sergeant Lampman knew when he seized Rafiq's phone around an hour before the interview with Rafiq ended in October 2017? First, even before Sergeant Lampman came to the interview, he knew VanHorne was claiming that Rafiq murdered Anderson with Anderson's own gun. Second, Lampman knew that VanHorne was blaming Rafiq for the murder, and that VanHorne had led police to the area where police found Anderson's remains. Third, Lampman knew VanHorne was claiming that Rafiq admitted arguing with Anderson on the morning Anderson was killed and that VanHorne

29

was claiming that Rafiq admitted that he shot Anderson after telling VanHorne he had taken care of the problem. Fourth, Lampman knew when he came to the interview that Rafiq, Anderson, and VanHorne had been living together before Anderson's murder. Fifth, Lampman knew that VanHorne and Rafiq moved out of the trailer after Anderson was killed and then continued living with each other for several weeks.

Turning to circumstances of Rafiq's interview, the videorecording of the interview shows that fairly early in the interview, it became apparent to Sergeant Lampman that Rafiq had his cell phone in his pocket. At Lampman's request, Rafiq voluntarily handed Lampman the phone. While Lampman as seen in the videorecording scrolls through the phone, Detective Crochet continues to ask Rafiq questions. Rafiq (as noted by Sergeant Lampman in the hearing on the motion to suppress) has his eyes glued on what Lampman is doing with the phone. Then, when Lampman asked Rafiq to allow police to extract the data from the phone, Rafiq refused. Minutes later, Rafiq, whom Lampman said was becoming increasingly nervous as he scrolled though the phone, asked that Lampman return the phone.

During the hearing on the motion to suppress, Lampman described why an officer would suspect Rafiq's phone contained evidence relevant to Anderson's murder. He testified that on the date he knew to be after police began investigating Anderson's disappearance, Rafiq confirmed that he had used his phone to communicate with VanHorne. Sergeant Lampman also asked Rafiq directly in the interview whether he shot Anderson. According to Lampman, Rafiq "really didn't answer me [when responding to that question] . . . and it was apparent that he got real nervous." Lampman also knew that Detective Crochet was not planning to arrest Rafiq that day, but instead planned to allow Rafiq to return to his home. And when Lampman seized the phone, Rafiq knew police had been asking him about Anderson, had asked him whether he shot Anderson, and that Rafiq had refused to allow police to extract data from his phone. Under the circumstances and viewing them as a whole, it was reasonable for Sergeant Lampman to have believed that Rafiq, after leaving the interview, would wipe the phone of all evidence of Anderson's murder if he remained in possession of his phone.

Given that cell phones are in such common use, that Rafiq and VanHorne were living together before and after Anderson's

31

disappearance, that Rafiq and Anderson were the focus of interest in the investigation being conducted by police, and that Rafiq confirmed he had used his phone after the investigation to communicate with VanHorne, it was objectively reasonable for a police officer with the information known to Lampman to reasonably suspect that Rafiq's phone would contain evidence of a crime relevant to Anderson's disappearance and death. Based on the totality of the circumstances, we hold that Sergeant Lampman had sufficient reasonable suspicion to justify temporarily seizing the phone to preserve the evidence that was on it for the time required to allow police to determine whether a magistrate would issue a search warrant allowing authorities to lawfully search the phone.[40] We further conclude the record supports the trial court's finding that exigent circumstances justified Sergeant Lampman's decision to temporarily seize the phone to preserve it while seeking a search warrant. We hold the trial court did not err in denying Rafiq's motion to suppress.

Turning to Rafiq's last issue, in which he argues the trial court erred in admitting the evidence obtained from the cell phone in his trial, we note that Rafiq has not argued on appeal that the search warrant was

---

[40] *See Riley v. California*, 573 U.S. 373, 375 (2014).

too broad or that the search warrant was invalid on some other ground like the phone was detained for a period longer than reasonable to obtain a warrant authorizing the phone to be searched. Instead, Rafiq argues the evidence extracted from his phone was inadmissible solely because the evidence extracted from it represents the fruits of an illegal seizure, an argument we have overruled.

For the reasons explained above, Rafiq's second and third issues asserting his rights were violated under the Fourth Amendment and under Article I, section 9 of the Texas Constitution are overruled.

## Conclusion

Having concluded the appellant's issues lack merit, the trial court's judgment is

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on March 23, 2022
Opinion Delivered August 31, 2022
Publish

Before Golemon, C.J., Kreger and Horton, JJ.

33